## Carroll Valley Borough Incorporation (No. 2)

*F. Joseph Larkin* of *Wolf & Oyler,* for petitioners.

*Thomas Oravets,* Deputy Attorney General, for Commonwealth.

*Donald P. McPherson, 3rd* and *Frances DelDuca,* for Tri-Valley Citizens Association.

*Murray B. Frazee, Jr.,* of *Swope & Frazee* and *Eugene R. Hartman,* for exceptants.

MACPHAIL, P. J., December 1, 1972.—On April 21, 1972, a petition for the incorporation of a borough was filed by what is alleged to be the majority of the freeholders residing within the limits of the proposed geographical boundary of the new borough. It appears that the borough will be composed of parts of three contiguous townships. Timely exceptions to the incorporation were filed. Preliminary matters have been disposed of by previous orders.

Exceptions filed to the application for incorporation included an attack upon the procedure followed by the proponents for incorporation and challenges regarding the legal status of the "freeholders" whose names appear on the application. The Commonwealth of Pennsylvania was given leave to be heard on the procedural question, since the constitutionality of the provisions of the present borough code under which the proponents were proceeding was raised. Arguments have been heard and briefs have been filed by all interested parties.

First, we will address ourselves to the procedural matter. Proponents have proceeded under the provisions of section 202 of The Borough Code of February 1, 1966, P. L. (1965) 1656, 53 PS §45202. In 1968, the Constitution of Pennsylvania was amended and provided, in pertinent part, section 8, art. IX, as follows:

"§8. Consolidation, merger or boundary change

"Uniform Legislation. The General Assembly shall, within two years following the adoption of this article, enact uniform legislation establishing the procedure for consolidation, merger or change of the boundaries of municipalities.

"Initiative. The electors of any municipality shall have the right, by initiative and referendum, to consolidate, merge and change boundaries by a majority vote of those voting thereon in each municipality, without the approval of any governing body.

"Study. The General Assembly shall designate an agency of the Commonwealth to study consolidation, merger and boundary changes, advise municipalities on all problems which might be connected therewith, and initiate local referendum.

"Legislative Power. Nothing herein shall prohibit or prevent the General Assembly from providing additional methods for consolidation, merger or change of boundaries."

The schedule to article IX provides for the effective date for article IX, sec. 8, as follows:

## SCHEDULE

"This new article and the repeal of existing sections shall take effect on the date of approval by the electorate, except that the following sections shall take effect on the effective date of legislation adopted pursuant to the sections or the date indicated below, whichever shall first occur.

"The first, third and fourth paragraphs of section eight shall take effect two years after the effective date . . ."

The legislature failed to act within the two-year period provided in the schedule. Exceptants contend that as of April 23, 1970, the expiration of the two-year period, all existing boundary change legislation was automatically invalidated by the legislature's failure to act, the result being that the provisions of article IV, sec. 8, now govern the incorporation of boroughs, exclusively. The proponents argue that those constitutional provisions do not apply to incorporation proceedings.

Proponents for incorporation rely heavily upon the case of In re: Incorporation of the Borough of New Stanton, Westmoreland County, decided December 9, 1968, affirmed per curiam, 218 Pa. Superior Ct. 742 (1970), wherein the Court of Common Pleas of West-moreland County held that the new constitutional amendment, article IX, sec. 8, does not apply to the incorporation of boroughs. In the opinion of the court, Judge Sculco held that, "Consolidation or merger of municipalities is distinct from the incorporation of a new borough. Incorporation forms a new political entity out of an old political entity. Consolidation or merger creates a new entity by joining or combining two old political subdivisions." The exceptants here argue, with some validity, that the same result could have been reached in the New Stanton Case without deciding the question of whether article IX, sec. 8, applies to the incorporation of boroughs. Therefore, exceptants contend that even though the lower court was affirmed per curiam, that decision would not be necessarily binding upon us in ruling upon the constitutional question now before us. Nevertheless, we do not believe that we can disregard the New Stanton case nor may we safely assume that the Superior Court did not intend to

affirm Judge Sculco's holding with respect to the effect of article IX, sec. 8, upon the incorporation of boroughs. The fact that the Superior Court decision was per curiam does not mean that it is entitled to any less weight than any other decision of that court. See Clarke v. Assurance Co., 146 Pa. 561 (1892).

The real difficulty in interpreting the meaning and the intent of article IX, sec. 8, is the construction to be applied to the words "boundary change." Were those words intended to include anything besides annexations, which were most certainly the real target of the amendment in view of all of the appellate cases critical of the seemingly inconsistent statutory law on that subject, or were the words intended to govern any boundary change without limitation?[1] The general principles governing the construction of statutes apply also to the interpretation of constitutions (Perry Co. T. & T. Co. v. Public Service Commission, 265 Pa. 274 (1919)), although wider interpretation may be given to constitutional language than to statutory language: Breslow v. Baldwin Township School District, 408 Pa. 121 (1962). However, there are some constitutional provisions that are not as broad as they sound and have recognized qualifications: Bromley v. McCaughn, 26 F.2d 380 (E.D. Pa., 1928). In construing constitutional provisions, we must consider not only the letter of the words but the spirit behind them as well: Commonwealth ex rel. Attorney General v. Beamish, 309 Pa. 510 (1932). The language of the Constitution is to be interpreted in its popular sense as the common people who adopted it must have naturally understood it when they voted

---

[1] It will be noted that in the present Borough Code, the "incorporation of boroughs" is a separate article (article II) from "change of borough limits" (article IV).

on it: Brereton Estate, 355 Pa. 45 (1946). While all of these standards are reasonable and logical, they are not particularly helpful in resolving the question now before us.

Perhaps, then, another approach would serve a more useful purpose. If, as the exceptants contend, the failure of the legislature to enact uniform legislation within the two-year period set forth in the amendment means that the initiative provisions of section 8 are the sole means of consolidating, merging or changing boundaries, then that provision must be self-executing. Furthermore, if the language was intended to apply to boundary changes without limitation, then it must be capable of being applied from a practical standpoint to every such boundary change. One or two examples should serve to show that the constitutional provisions simply cannot be applied to *every* boundary change. If the electors in parcel A of Anytown wished to incorporate as a separate borough, how would they proceed? If the question were placed on the ballot, what basis would be used to determine that a majority of the electors in *each municipality* had voted favorably or unfavorably? The proposed new borough, of course, would not yet be a municipality. Therefore, conceivably, a majority of the electors in Anytown could vote in favor of the new borough, but a majority of those actually living within the geographical limits of the new borough, although opposed to the new borough, could not prevent it, since the vote of the electors in that area could not be separately counted. By the same token, if the electors of Anytown wanted to get rid of parcel A because it was an undesirable section of the community, those electors again could get the question on the ballot and by the same process used in the previous example create the new

borough against the will of those who would have to live in that new borough. We do not believe that such a result was ever intended by the Constitutional Convention.

In "Debates of the Pennsylvania Constitution Convention of 1967-1968," volume 2, at page 798, Delegate (now Justice of the Supreme Court) Manderino, co-chairman of the Committee on Local Government, said to the convention:

"Section 8 has four essential sections to it. Under Consolidation, Merger or Boundary Change, we have had various questions about the meaning of this. I shall take them one section at a time here.

"The first one, that the General Assembly shall provide, within two years, uniform legislation establishing a procedure for consolidation, merger or change of boundaries in municipalities, *was intended to actually eliminate the hodgepodge of legislation which governs these matters in various municipalities.* Under this first paragraph, we shall address ourselves directly to the question of what is called *piecemeal annexation.* Section 8 does not prevent piecemeal annexation as it now exists, but it does say that if the General Assembly is going to permit it to exist, it must permit it to exist on a uniform basis throughout all municipalities in order that the same reasons that might necessitate *piecemeal annexation* from, for instance, a second class township as today might necessitate it in a given condition from a borough or first class township or a city—highly unlikely, but still possible—and that the municipalities should be treated uniformly since we have all sorts of municipalities and all the classifications which range from very low population figures to very high population figures.

"The second paragraph called Initiative would give the rights to municipal governments if they wish to consolidate, merge or change boundaries, that if a majority of those in *each municipality* vote and desire to consolidate, merge or change boundaries, they could not be prevented from doing so . ." (Italics supplied.)

Again, on page 740, Delegate Manderino addressed the convention in these terms:

"Section 1 consists of three lines, two sentences. The first sentence appears simple and innocuous, but it really establishes the General Assembly's power over local government that it 'shall provide by general law for local government within the Commonwealth.' It is not just an opening statement. It, in effect, is stating that the General Assembly provide generally—that is the way we are starting—for local government. I just might add there, as an example, we have had questions, for instance, why did you not provide in here for the incorporation and dissolution of municipalities? There are a lot of things which are not specifically spelled out that are not in the Constitution now, but that first sentence establishes the authority of the General Assembly to provide general law for municipalities in the Commonwealth . . ."

However one interprets those remarks, it is clear that the delegates knew that section 8 did *not* cover the question of the incorporation and dissolution of boroughs. Since the intention of the convention was to mandate "uniformity" by the implementation of section 8 and there was no previous problem of uniformity in the incorporation or dissolution of boroughs, we may safely assume the omission was not only obvious but intentional.

For the above reasons, we conclude that article IX, sec. 8, does not apply to the incorporation of boroughs.

Next is the question of what law does apply? Here, the argument is made that if the legislature was given the authority to act but did not act and if article IX, sec. 8, does not cover the situation, is there any law pertaining to the incorporation of boroughs? We hold that the provisions of The Borough Code relating to the incorporation of boroughs, Act of February 1, 1966, P.L. (1965) 1656, secs. 201-19, 53 PS §§45201-45219, inclusive, were not repealed by the new Constitution and are not in conflict with it.[2] Accordingly, the proponents' election to proceed under the provisions of The Borough Code is correct.

Having concluded that the provisions of The Borough Code apply to the proceeding before us, we now must determine what is meant by the words "majority of the freeholders residing within the limits of the proposed borough," as set forth in section 202 of that code. While there is no evidence before us to support the fact, it appears from the briefs of counsel that many of the lots and homes in the area of the proposed borough are owned by persons who do not occupy them year-round. Many of the homes are occupied either seasonally or only on weekends. Exceptants contend that such persons, though freeholders, cannot be considered in determining what constitutes a majority of freeholders for the purpose of incorporating a borough, because such persons do not "reside" within the limits of the proposed borough.

---

[2] There is a "saving clause" in The Borough Code, supra, section 104, 53 PS §45104.

One previous case has been decided on this very point. In In re: Harvey's Lake Boro. Incorporation (No. 1), 57 Luz. 45, 58 Mun. L. R. 282 (1966), a case closely approximating the one before us on its facts, it was held that "summer residents" have the right to petition for the creation of a borough. The opinion in the Harvey's Lake case cites numerous cases distinguishing "residence" and "domicile," and also cites at least two cases in other jurisdictions where those who were not year-round residents were considered as "resident freeholders" for purposes other than the incorporation of a borough: McGrath v. Stevenson, 194 Wash. 160, 77 P.2d 608 (1938), and City of St. Louis v. Temples (Mo.), 149 S.W. 2d 888 (1941). What strikes us as even more persuasive in the Harvey's Lake opinion, however, is the following, page 295: "The summer residents have as much interest in the form of government as the year round residents. Their properties are vastly more expensive than those of the year round residents. These represent large investments and certainly the residents should be entitled to have the form of government which will serve them best. They are willing to pay double their present taxes in order to obtain a form of government which will be responsive to their needs."

In determining the interpretation to be given to statutory language, we have the right to consider the consequences of a particular interpretation: Act of May 28, 1937, P.L. 1019, sec. 51, 46 PS §551. Here, we must consider that persons owning residential property where they reside, for any length of time, are quite interested in the police protection, fire protection, tax laws, and every other aspect of municipal government. As pointed out in the Harvey's Lake case, supra, a man can have more than one

residence for legal purposes. Who is to say how long one must actually live in the proposed municipality in order to be considered as "residing" there? Should it be six months and one day, 11 months, 12 months? The most reasonable conclusion is that one who "resides," i.e., lives, in the municipality for *any* length of time is a resident for the purpose of determining what constitutes a majority of the freeholders residing in the geographical area proposed to be incorporated as a borough. If we accept the exceptants' contention that to be a resident for the purpose of incorporating a borough one should be at least eligible to vote, 30 days is all that is required to be eligible to register to vote under the provisions of Act No. 184 of the 1972 Session of the General Assembly: Act of July 12, 1972, P.L. 466, 25 PS §951-19. That is certainly something less than a "permanent" resident. In one of the appellate cases distinguishing "residence," "habitation" and "domicile," "residence" has been defined as "a tarrying place for some specific purpose of business *or* pleasure": Lesker Case, 377 Pa. 411 (1954). We are satisfied that our conclusion in this respect is compatible with that definition. (Italics supplied.)

Accordingly, we conclude that a freeholder who lives, however briefly, within the geographical boundaries of the area proposed to be incorporated, must be considered in determining what constitutes a majority of the freeholders for the purpose of incorporation.

Finally, the question has been raised as to whether a husband and wife owning real estate jointly shall be considered as one or two freeholders. Proponents contend that a husband and wife owning real estate as tenants by the entireties constitute two freeholders. Exceptants contend that they are but one

freeholder. The case of Millersville Annexation Case, 447 Pa. 310 (1972), held that a tenancy by the entireties should be counted as one rather than two freeholders for the purpose of determining whether a majority of freeholders had signed a petition to effectuate annexation. The Supreme Court overruled previous decisions of the Superior Court in this regard. We have found no cases where the specific question now before us has been raised and resolved. While it is true that the Supreme Court decision in the Millersville case, supra, was designed to promote uniformity in the construction of similar terms appearing in the Borough and Second Class Township Codes, we think the decision also has much to commend it for the purpose of determining the answer to our problem. While there is no problem of *uniformity*, there would seem to be a desirable result if there was *conformity*. Moreover, to hold husband and wife as a single freeholder seems to us to be consistent with fundamental principles of real estate law. "At common law, husband and wife were considered as but one person or legal entity, even though the legal entity was composed of two natural persons. Hence they were unable to take an estate by moieties. . . ., but together they took a single interest in the entire estate, . . . neither tenant by entirety owns any undivided share at all; both together, as a single entity, own the whole, or entire, estate. . . . The estate of joint tenants is a unit made up of *divisible* parts; that of the husband and wife is also a unit; but it is made up of *indivisible* parts": Ladner on Conveyancing in Pennsylvania, pages 18 and 19, §1:15. If the estate cannot be divided, then it seems reasonable to conclude that its owners cannot be "divided" either. While such a conclusion may run counter to current

trends in the field of individual rights, it is consistent with the Millersville case and consistent with real estate law.

In conclusion, it seems only fair to say that in none of the three issues to which we have addressed ourselves in this opinion is there controlling case law. Each of the issues is an important one and in each of them there are very persuasive arguments both ways. Hopefully, by the time this case reaches the point where a final order has been entered, some if not all of these issues will have been resolved by legislative action or appellate decision.

### ORDER OF COURT

And now, December 1, 1972, the court having held that the proponents have authority to proceed under the provisions of the Act of February 1, 1966, P.L. (1965) 1656, it is ordered that the within matter be and it is hereby set down for an evidentiary hearing under the provisions of section 204 of the aforesaid act, said hearing to be held January 12, 1973, at 9:30 a.m.